IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


RICHARD L. BRATTON                    )
                                      )
v.                                    )        NO. 2:06-0075
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security[1]    )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a light level of work during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 13) should be denied.

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

## I. INTRODUCTION

The plaintiff filed DIB and SSI applications on October 4, 2000,[2] (Tr. 69, 1065) alleging disability due to bipolar disorder, social anxiety disorder, and injuries that he received in an automobile accident, two broken legs, a broken ankle, a crushed ankle, two broken feet, a broken pelvis, a bruised liver, and a reconstructed left hip joint, with a disability onset date of September 4, 2000. (Tr. 97.) The plaintiff's applications were denied initially and upon reconsideration. (Tr. 41-45, 48-51.) A hearing before Administrative Law Judge ("ALJ") Mack H. Cherry was held on January 14, 2004. (Tr. 1152-1206.) The ALJ delivered an unfavorable decision on August 10, 2004, (Tr. 25-33), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 20, 22.) On July 27, 2006, the Appeals Council denied the plaintiff's request for review (Tr. 9-12), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on October 9, 1951, and was 48 years old as of September 4, 2000, his alleged onset date. (Tr. 69.) He completed the tenth grade and subsequently earned a GED.[3] (Tr. 103, 1156.) From July 9, 2001, to March 20, 2003, the plaintiff took courses in Computer Electronics at Tennessee Technology Center and received a Computer and Network Service Technician diploma. (Tr. 153-56.) His past jobs include employment as an office manager, cemetery

---

[2] The plaintiff's applications for DIB and SSI are date stamped October 4, 2000, but he signed and dated them October 6, 2000. (Tr. 69, 1065.)

[3] The plaintiff indicated in his disability report that he completed the tenth grade, but he later testified that he completed the eleventh grade. (Tr. 103, 156.)

2

worker, custodian, warehouse manager, cab driver, building maintenance worker, electrician's assistant, cleaning crew manager, and clown. (Tr. 77, 98, 1197-1200.)

## A. Chronological Background: Procedural Developments and Medical Records

Prior to his alleged onset date, the plaintiff had a history of multiple suicide attempts and suicidal ideations. (Tr. 732, 736, 751, 772, 800.) He also had been admitted into rehabilitation programs for polysubstance abuse treatment. (Tr. 171-85, 261-62.)

On September 5, 2000, the plaintiff was admitted to Vanderbilt University Medical Center ("VUMC") and treated for multiple traumas following an automobile accident. (Tr. 340.) He was diagnosed with a left posterior wall acetabular fracture, right open knee joint, right pilon fracture, left distal tibia fracture, nasal fracture, liver laceration, and small right pneumothorax. *Id.* The plaintiff underwent multiple surgeries, performed by Dr. Marcus Sciadini, including an open reduction and internal fixation of the left acetabular fracture and of the right distal fibula, a closed reduction and percutaneous screw fixation of the left distal tibia and fibula, and a closed reduction of the nasal fracture. (Tr. 490-506.)

On September 21, 2000, the plaintiff underwent a psychiatric evaluation and he reported that he was diagnosed with bipolar syndrome in 1976 and has had multiple suicide attempts. (Tr. 448-50.) The plaintiff was diagnosed with bipolar disorder and alcohol and cocaine dependence, and he was assigned a Global Assessment of Functioning ("GAF") score of 30.[4] (Tr. 450.) On the same

---

[4] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 21 and 30 falls within the range of "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment [or] inability to function in almost all areas." DSM-IV-TR at 34.

Case 2:06-cv-00075   Document 19   Filed 01/26/10   Page 3 of 43 PageID #: 80

day, the plaintiff was transferred from VUMC to Vanderbilt Stallworth Rehabilitation Hospital ("VSRH") for physical, occupational, and speech therapy services. (Tr. 342-43.) While at VSRH, nursing progress notes indicated that the plaintiff was alert and pleasant, and that although his cognition was initially impaired and he had difficulty functioning mentally, both conditions improved over the course of his hospitalization. (Tr. 427-47, 451-76.) Dr. Thomas Groomes examined the plaintiff on several occasions at VSRH and noted that the plaintiff's cognition was improving and that he was receiving psychiatric treatment for his bipolar disorder (Tr. 420.)

On September 22, 2000, Dr. Paul Ragan, a VSRH psychiatrist, diagnosed the plaintiff with "post-traumatic encephalopathy, bipolar disorder depressed, and alcohol dependence." (Tr. 418.) Dr. Ragan prescribed Effexor[5] and Neurontin[6] for the plaintiff. *Id.* On the same day Dr. Groomes stated that although the plaintiff "continue[d] to have confused speech," he did show signs of improvement. (Tr. 416.) Over the next two weeks, Dr. Groomes examined the plaintiff on nearly a daily basis and found that his bipolar disorder was being controlled by medication, that he did not have suicidal ideation, and that the injuries to his lower extremities were improving. (Tr. 405-20.) On October 11, 2000, the plaintiff was discharged from VSRH and transferred to a long term nursing care facility (Tr. 343, 608), and it was recommended that he continue his speech therapy services "to address improvement of attention skills, memory, problem solving, reasoning, and executive functioning;" continue physical therapy to improve his lower extremity strength; and continue

---

[5] Effexor is prescribed to treat depression and abnormal anxiety. Physicians Desk Reference 3504 (64th ed. 2010) ("PDR").

[6] Neurontin is used as an "anticonvulsant for partial-onset seizures." Saunders Pharmaceutical Word Book 488 (2009) ("Saunders").

4

occupational therapy to improve his upper body strength. (Tr. 343.)  The plaintiff's discharge summary also described his motor vehicle accident as a suicide attempt. *Id.*

On October 17, 2000, social worker Kristian Stewart completed a Social Work Assessment Report on the plaintiff and reported that the plaintiff's cognition had improved since his automobile accident, but that he still had problems with his judgment. (Tr. 595.)  Ms. Stewart found that the plaintiff had "[p]eriods of altered perception or awareness of surroundings" and that his "[m]ental function varies over the course of the day." (Tr. 597.)  On October 24, 2000, Ms. Stewart conducted another series of assessments and noted that the plaintiff was being treated for depression, anxiety, manic depressive disorder, and mood decline. (Tr. 573.)  She indicated that the plaintiff was still having difficulty regaining his full cognition and self-sufficiency (Tr. 574, 578), but that he was able to interact with others and was involved in a behavior management program. (Tr. 580, 588.)

On October 30, 2000, the plaintiff presented to Maury Regional Hospital with complaints of abdominal pain. (Tr. 356.)  He was diagnosed with acute cholecystitis and underwent an open cholecystectomy and operative cholangiography the next day. (Tr. 360.)  On November 6, 2000, the plaintiff was discharged and able to tolerate "p.o. [post operation] without difficulty." (Tr. 385-86.)

On November 11, 2000, a Tennessee Disability Determination Section ("DDS") evaluator concluded that the plaintiff met Listings 11.04 and 11.18 of 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 387.)  On December 5, 2000, DDS psychiatrist Dr. Ralph Barr completed a psychiatric evaluation of the plaintiff and found that the plaintiff was oriented, pleasant, and cooperative. (Tr. 512-13.)  The plaintiff related that he was not depressed and did not have suicidal ideation, but that he did have "considerable anxiety." (Tr. 513.)  Dr. Barr diagnosed the plaintiff with bipolar disorder not otherwise specified and a history of alcohol abuse, and he concluded that he had

5

"[s]evere-adjusting to life changes due to injuries." *Id.* Dr. Barr assigned the plaintiff a GAF score of 55[7] and prescribed Effexor, Klonopin,[8] and Depakote[9] for him. *Id.* On the same day, the plaintiff presented to Dr. Heather Bazzel and she reported that he had mood swings, was depressed, and was worried about the future. (Tr. 557.) Dr. Bazzel concluded that the plaintiff was not psychotic or suicidal. *Id.* On December 15, 2000, Dr. Barr examined the plaintiff and noted that he was "better" and "more cooperative," but a week later Dr. Barr indicated that he displayed an irritable mood and prescribed Zyprexa[10] and increased his prescription of Effexor. (Tr. 515.)

On December 22, 2000, DDS physician Dr. Richard Smith, a neurological consultant, reviewed the plaintiff's medical records and concluded that the original DDS evaluation, which found that the plaintiff met Listings 11.04 and 11.18, was clearly contradicted by the medical evidence. (Tr. 388.) Dr. Smith stated that the medical evidence was "consistent with a not severe rating for traumatic brain injury under [Listings 11.04 and 11.18]." *Id.*

On December 27, 2000, DDS physician Dr. Perry White, a consultant in orthopedic surgery, reviewed the plaintiff's medical records and also concluded that the original DDS determination was "clearly contradicted by the evidence." (Tr. 390-91.) He opined that the plaintiff's injuries were expected to heal by September 3, 2001, and that the plaintiff would be "at least sedentary" by that date. (Tr. 390.) Dr. White also completed a physical Residual Functional Capacity Assessment ("RFC") to determine the plaintiff's ability to do physical work-related activities. (Tr. 393- 400.)

---

[7] A GAF score of 51-60 falls within the range of "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

[8] Klonopin is used to treat seizure disorders and panic disorder. PDR at 2855.

[9] Depakote is prescribed to treat mania, epilepsy, and migraines. PDR at 426.

[10] Zyprexa is used to treat bipolar disorders, depression, and schizophrenia. PDR at 1984.

6

He opined that in an eight hour workday the plaintiff could lift and/or carry 10 pounds occasionally and frequently, stand/walk for two hours, and sit for six hours. (Tr. 394.) Dr. White found that the plaintiff could occasionally push or pull with his lower extremities, frequently balance on level ground, occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl. (Tr. 394-95.) He also opined that the plaintiff should never balance on uneven ground or climb ladders, ropes, or scaffolds. (Tr. 394-95.) On the same day, VUMC treatment notes indicate that although the plaintiff was recovering from the injuries to his lower left extremity, "his right ankle [had] deteriorated as expected" and Dr. Sciadini recommended a right ankle fusion. (Tr. 485-86.)

On January 4, 2001, DDS physician Dr. Richard Gann reviewed the plaintiff's medical records and concluded that given his "extensive psychiatric history with a recent suicide attempt . . . a complete review of symptoms for Bipolar Disorder and substance dependence, a descriptive mental status examination, and detailed third party functional data" was needed. (Tr. 401.) On January 18, 2001, Dr. Sciadini examined the plaintiff and diagnosed him with right ankle post traumatic arthritis and performed right ankle fusion surgery on the plaintiff. (Tr. 481-84.) On January 26, 2001, Dr. Barr noted that the plaintiff was "much more stable, more outgoing [and] cheerful," and that although his physical recovery was slow, he hoped to go back to work. (Tr. 515.)

On February 6, 2001, two weeks after the plaintiff's right ankle fusion surgery, Dr. Sciadini examined the plaintiff and reported that he had no complaints and "no significant pain in his ankle." (Tr. 480.) On March 9, 2001, Dr. Barr examined the plaintiff and indicated that his mood had improved and that he was "recovering some" from his injuries. (Tr. 515.) Dr. Barr also continued to prescribed Neurontin, Effexor, and Zyprexa for the plaintiff. *Id.* Dr. Sciadini examined the plaintiff again on March 12, 2001, and found the plaintiff's right ankle to be solidly fused and that

7

it could be moved "without pain." (Tr. 541.)  Dr. Sciadini opined that the plaintiff could begin putting weight on his right lower extremity and that after a follow-up examination in two to three months he expected that the plaintiff would be able to return to work. *Id.*

On March 23, 2001, the plaintiff was admitted to Centerstone Community Mental Health Center ("Centerstone") and at intake, he was found to have a "severe and persistent mental illness" (Tr. 1038), below average judgment, past suicidal ideation, chronic physical health problems, and mood swings (Tr. 1023-24), and he was assigned a GAF score of 47.[11] (Tr. 1019.)

On March 28, 2001, the plaintiff returned to Dr. Sciadini and reported that he had pain in his right foot. (Tr. 540.)  Dr. Sciadini found no swelling in the plaintiff's right foot and attributed his pain to his increased activity level. *Id.*  On March 30, 2001, Dr. Thomas Pettigrew, Ed.D., completed a psychological evaluation on the plaintiff. (Tr. 518-24.)  The plaintiff reported that he had occasional hallucinations and social anxiety, his mania was improving, he was "fully independent in meeting all of his personal needs," and he could wash dishes, assist with laundry, and perform simple cooking tasks. (Tr. 520-23.)  Dr. Pettigrew concluded that

> Mr. Bratton show[ed] no signs of impaired ability to understand, remember or carry out simple verbal instructions.  During the administration of psychological tests he demonstrated good attention, concentration and persistence.  He was intrinsically motivated and did not appear to be distracted by internal or environmental stimuli.  He demonstrated excellent verbal and communication skills.  Although he reported some ongoing experience with both auditory and visual hallucinations, his clinical presentation and responses to psychodiagnostic tests revealed no evidence of current psychosis.

(Tr. 523-24.)

---

[11] Many of the written notations in the plaintiff's medical records from Centerstone were illegible. (Tr. 871-1038.)

8

The plaintiff was examined at Centerstone on April 11, 2001, and his appearance and affect were appropriate, mood was normal, and speech was organized. (Tr. 994.) On April 18, 2001, Dr. James Walker, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff. (Tr. 525-38.) Dr. Walker opined that the plaintiff exhibited affective disorders and substance addiction disorders but that his impairments were not severe. (Tr. 525.) He noted that the plaintiff's unstable mood was the result of "possible mania [or] drug-induced dysphoria." (Tr. 528.) Dr. Walker reported that the plaintiff's activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace were all mildly restricted. (Tr. 535.) He also noted that the plaintiff suffered from one or two repeated episodes of decompensation. *Id.* Dr. Walker found that the ratings Dr. Barr assigned the plaintiff were "inconsistent with his function and . . . near normal mental health status," and that the plaintiff was able to shop and attend church. (Tr. 537.) He explained that the plaintiff's medical record evidence supported "a history of severe mood, substance, and head injury problems that have now abated with treatment, abstinence, and physical recovery." *Id.*

On May 2, 2001, the plaintiff was examined at Centerstone and was found to have an appropriate appearance, depressed mood, blunted affect, and organized speech. (Tr. 992.) Centerstone progress notes indicated that the plaintiff was having auditory and visual hallucinations. *Id.* On May 7, 2001, the plaintiff presented to Dr. Sciadini with complaints of occasional left groin pain and no complaints of right foot pain. *Id.* Dr Sciadini noted that the plaintiff was able to walk in "normal shoe wear and fully weight bearing without pain in either ankle," and stated that he "should be ready to return to work without restrictions beginning in June [2001]." *Id.*

9

On May 17, 2001, and May 24, 2001, Centerstone case manager Jolynne Stackhouse examined the plaintiff and found that his appearance and affect were appropriate, mood was normal, and speech was organized. (Tr. 991-92.) Dr. Barr examined the plaintiff on June 6, 2001, and noted that the plaintiff's mood and attention span had improved. (Tr. 989.) The plaintiff presented to Ms. Stackhouse twice in June of 2001 and her diagnoses of him remained unchanged. (Tr. 986-88.) The plaintiff reported that his medication was working and that he "had been repairing computers locally." (Tr. 988.) On July 2, 2001, Dr. John Faccia examined the plaintiff and diagnosed him with right foot pain. (Tr. 851.) The plaintiff returned to Dr. Barr on July 18, 2001, and noted that the plaintiff was "doing well" in computer school and he increased the plaintiff's dosage of Wellbutrin[12] and decreased his dosage of Effexor. (Tr. 984.)

On August 1, 2001, Dr. Victor A. Pestrak completed a PRTF on the plaintiff and diagnosed him with a personality disorder, not otherwise specified. (Tr. 656-68.) Dr. Pestrak determined that the plaintiff was mildly restricted in his activities of daily living and had mild difficulty maintaining social functioning, concentration, persistence, or pace. (Tr. 666.) Dr. Pestrak noted that the plaintiff had no episodes of decompensation and concluded that he had "[n]o significant impairment." (Tr. 666, 668.)

On August 20, 2001, Dr. Faccia examined the plaintiff and diagnosed him with right foot pain. (Tr. 850.) He recommended that the plaintiff use heat and ice to treat his foot pain. *Id.* On the same day, Dr. Helena Perry completed a physical RFC assessment of the plaintiff (Tr. 669-76) and opined that he could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand

---

[12] Wellbutrin is an antidepressant used in the treatment of major depressive disorder. PDR at 1719.

or walk at least two hours in an eight hour workday, sit for a total of six hours in an eight hour work day, and perform an unlimited amount of pushing or pulling with hand or foot controls. (Tr. 670.) Dr. Perry also found that the plaintiff could occasionally climb a ramp or stairs, but could never climb a ladder, rope, or scaffolding. (Tr. 671.)

On August 29, 2001, the plaintiff presented to the Spectrum Pain Clinic ("Spectrum") with complaints of pain in his left hip, left and right ankle, and right knee. (Tr. 693-700.) Dr. Barr examined the plaintiff on the same day and on October 10, 2001, and his assessment remained unchanged from his previous visit in July of 2001. (Tr. 982-83.) On October 11, 2001, the plaintiff presented to Dr. Faccia with complaints of "muscle jerking and twitching." (Tr. 849.) Dr. Faccia diagnosed the plaintiff with "muscle spasm[s]." *Id.* On the same day, Centerstone nurse Rose Thomas completed a Clinically Related Group ("CRG") form on the plaintiff and noted that he was diagnosed with bipolar disorder and alcohol dependence, and she assigned him a GAF score of 63.[13] (Tr. 978.) Ms. Thomas determined that the plaintiff's concentration and ability to perform activities of daily living were moderately impaired and that his interpersonal functioning and ability to adapt to change were markedly impaired. (Tr. 979-80.) She noted that the plaintiff was dependent on others, avoided relationships, had difficultly concentrating, and had severe depression. *Id.*

The plaintiff returned to Spectrum on October 17, 2001, with complaints of having no feeling in his toes. (Tr. 692.) He related that his level of pain was an eight out of ten and increased with activity and decreased when he took medication. *Id.* On November 14, 2001, the plaintiff presented to Spectrum and reported left foot and hip pain. (Tr. 691.) He stated that his pain was a seven out

_____

[13] A GAF score of 61-70 falls within the range of "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

11

of ten, and that it increased with activity, bending, and lifting and decreased with rest, medication, heat, and ice. *Id.* Nearly a month later, the plaintiff's level of pain increased to an eight out of ten, but his symptoms and evaluation remained unchanged. (Tr. 690.)

On January 9, 2002, Dr. Barr examined the plaintiff and found that his mood had worsened recently, but that he was a low suicide risk. (Tr. 971.) Dr. Barr assigned the plaintiff a GAF score of 63 and noted that he was taking Effexor. *Id.* On January 10, 2002, the plaintiff presented to Spectrum with pain in both legs. (Tr. 689.) The plaintiff's pain increased with activity, rest, twisting, bending, and lifting, and it decreased when he took Celebrex.[14] *Id.* He reported that when he took his medication, his pain level was a two out of ten. *Id.* The plaintiff's next three medical evaluations at Spectrum on February 11, 2002, March 11, 2002, and March 25, 2002, remained largely unchanged. (Tr. 686-88.) On April 17, 2002, the plaintiff reported having lower leg pain and that when he took his pain medication, his pain level was a three out of ten. (Tr. 684.) Dr. Bar examined the plaintiff one week later and determined that he had a positive outlook, was not sad, and improved anxiety levels. (Tr. 967.) Dr. Barr noted that the plaintiff was attending vocational school, assigned him a GAF score of 64, and prescribed Effexor for him. *Id.* The plaintiff presented to Spectrum on May 22, 2002, and June 19, 2002, with complaints of leg, hip, and foot pain, but he reported that his pain level was a zero out of ten when he took his medication. (Tr. 681-82.)

On July 24, 2002, Dr. Barr examined the plaintiff and found that his mood was level and his suicide risk was low. (Tr. 965.) He assigned the plaintiff a GAF score of 64 and continued the plaintiff's prescription of Effexor. *Id.* On July 31, 2002, Centerstone completed a CRG form on the plaintiff and determined that his activities of daily living and concentration were moderately

---

[14] Celebrex is an anti-inflammatory medication. PDR at 3272.

12

impaired, and that his interpersonal functioning and ability to adapt to change were markedly impaired. (Tr. 1045-46.) Centerstone's CRG assessment indicated that the plaintiff's mental illness was severe and persistent and that he had a GAF score of 64. (Tr. 1047.) The plaintiff returned to Dr. Barr on November 27, 2002, and reported that he "like[d] computer classes and hope[d] to eventually get [a] job." (Tr. 960.) Dr. Barr noted that the plaintiff had a "much more even [and] level mood" and that his attention and concentration was "much better." *Id.* Dr. Barr assigned the plaintiff a GAF score of 63 and continued his prescription of Effexor. *Id.*

On December 19, 2002, a second Centerstone CRG assessment on the plaintiff indicated that his activities of daily living and concentration were moderately impaired, and that his interpersonal functioning and ability to adapt to change were markedly impaired. (Tr. 1042-43.) Centerstone's CRG assessment noted that the plaintiff's mental illness was severe and persistent and that he had a GAF score of 63. (Tr. 1044.) A Centerstone mental status evaluation of the plaintiff on December 31, 2002, indicated that he had a depressed mood, difficulty sleeping, and no suicidal ideation, and that he was attending vocational school three days a week. (Tr. 954-55.) On January 7, 2003, the plaintiff had a right foot exam that revealed "[m]ild osteoporosis" but no other significant abnormalities. (Tr. 848.)

The plaintiff returned to Centerstone on January 10, 2003, and he was diagnosed with a depressed and anxious mood and affect, but he did not have any suicidal ideation. (Tr. 948.) A Centerstone progress note from January 21, 2003, indicated that the plaintiff reported having suicidal ideation with a plan to overdose and that a case manager encouraged him to go to the emergency room for an assessment. (Tr. 943-44.) On January 22, 2003, the plaintiff contacted Centerstone and reported that he was depressed and still taking his medication. (Tr. 942.) Two days later, the

Case 2:06-cv-00075   Document 19   Filed 01/26/10   Page 13 of 43 PageID #: 90

plaintiff contacted Centerstone and related that his medications were not working and that "he was continuing to experience depression." (Tr. 938, 940.)

On January 28, 2003, the plaintiff contacted Centerstone and stated that "he was taking only 3 Effexor [pills] instead of 4" and his case manager advised him to take his medications as prescribed by his doctor. (Tr. 936.) Two days later, Centerstone evaluated the plaintiff and found that he was having difficulty sleeping and concentrating in school, became anxious and depressed "over new things in his life," and had stopped taking his prescribed Ritalin. (Tr. 933-34.) Centerstone recommended that the plaintiff receive individual therapy and take his prescribed medication to "[d]ecrease symptoms of negative behaviors and mood[s]," and advised him to attend Alcoholics Anonymous sessions for help in recovering from alcohol abuse. (Tr. 930-31.)

On February 7, 2003, Centerstone diagnosed the plaintiff with alcohol abuse, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD") and assigned him a GAF score of 47.[15] (Tr. 924.) Centerstone recommended that the plaintiff take his medications, keep his scheduled medical appointments, and report any side effects from his medication. (Tr. 921.) On February 18, 2003, Dr. Faccia diagnosed the plaintiff with right ankle pain and osteoporosis, and he recommended that the plaintiff use heat and ice and take his medication to treat his ankle pain.[16] (Tr. 847.) The plaintiff returned to Centerstone on February 20, 2003, and reported that he had difficulty sleeping, was able to attend church and school, and had improved concentration due to his ADHD medication. (Tr. 910-11.) On March 3, 2003, the plaintiff presented to Dr. Faccia and he was diagnosed with

---

[15] A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[16] Dr. Faccia examined the plaintiff on February 24, 2003, but his treatment notes are illegible. (Tr. 846.)

right ankle pain. (Tr. 845.)  On the same day, the plaintiff contacted Centerstone and stated that although he was depressed from breaking up with his girlfriend, he was still attending school. (Tr. 909.)

On March 4, 2003, x-rays of the plaintiff's right foot were largely unremarkable. (Tr. 844.) Centerstone treatment notes from the same day indicate that the plaintiff contacted his insurance company and threatened to shoot himself if the insurance company did not pay for his pain medication. (Tr. 907.)  Law enforcement spoke to the plaintiff, determined that he did not have any weapons, and allowed him to stay at his home. *Id.*  On March 14, 2003, Centerstone noted that the plaintiff was depressed and anxious and had difficulty completing simple tasks, but he was also medication compliant and did not have suicidal ideation. (Tr. 904-05.)  One week later, the plaintiff related to Centerstone that he was still attending school and was taking his medication. (Tr. 902.) He also reported that he heard voices but that the voices did not interfere with his activities of daily living. (Tr. 903.)

The plaintiff returned to Centerstone on April 9, 2003, and although he was diagnosed with an "appropriate" mood and affect and no suicidal ideation, he related that he stopped attending school. (Tr. 900-01.)  Centerstone noted that the plaintiff had difficulty responding to change or completing simple tasks due to his anxiety, but was "trying to put himself as much more disabled than he is" and "has a tendency to become more preoccupied with his needs and health problems and 'wallowing' in his preceived [sic] problems." (Tr. 899-900.) The plaintiff also stated that he was still hearing voices, but that the voices did not interfere with his daily activities. (Tr. 899.)

On April 14, 2003, Centerstone completed a third CRG assessment on the plaintiff that indicated his activities of daily living, interpersonal functioning, concentration, and adaptation to

15

change were moderately impaired. (Tr. 1039-40.) Centerstone's CRG assessment noted that the plaintiff's mental illness was severe and persistent and that he had a GAF score of 58. (Tr. 1041.) On April 17, 2003, the plaintiff presented to Dr. Barr and reported that he could "barely function." (Tr. 896.) Dr. Barr noted that the plaintiff did not have any suicidal ideation and concluded that he should take his prescribed medication and continue attending his therapy sessions. (Tr. 897.) Dr. Faccia examined the plaintiff on May 2, 2003, and May 22, 2003, and diagnosed him with right foot pain and recommended that he elevate and apply heat and ice to his foot. (Tr. 842-43.)

On May 29, 2003, the plaintiff returned to Centerstone and was told that due to his "progress and improvement" that he would be "closed out of [case management] services" at Centerstone. (Tr. 894-95.) The plaintiff did not agree with Centerstone's decision and was told to speak to his doctor if he needed further services. (Tr. 895.) Dr. Barr also examined the plaintiff and found his mental status exam unremarkable and prescribed Ritalin for him. (Tr. 891-92.) The plaintiff reported that he received a diploma from Tennessee Technical Center for computer networking and repair. (Tr. 890.) On July 7, 2003, the plaintiff had x-rays taken of his right leg and foot that revealed "old healed right ankle fractures," osteoporosis, and degenerative changes, but also indicated that there were no additional fractures or abnormalities. (Tr. 840-41.)

Dr. Barr examined the plaintiff at Centerstone on June 26, 2003, and July 17, 2003, and indicated that the plaintiff's condition remained largely unchanged from his previous appointment on May 29, 2003. (Tr. 885- 88.) On July 24, 2003, the plaintiff reported to Centerstone that he maintains his home, has poor concentration and ADHD problems, and becomes depressed with change. (Tr. 883.) He also stated that his mood was stable and that he had not used alcohol in over a year. (Tr. 884.) Centerstone completed a clinical crisis safety plan on the plaintiff and noted that

16

he had a history of suicidal thinking and auditory hallucinations, and Centerstone advised the plaintiff to contact crisis services or a mental health center, or go to the emergency room when such thoughts or episodes occurred. (Tr. 882.)  On August 2, 2003, Centerstone completed a fourth CRG assessment on the plaintiff that indicated his activities of daily living and interpersonal functioning were moderately impaired, and that his concentration and adaptation to change were markedly impaired. (Tr. 1059-60.)  Centerstone's CRG assessment noted that the plaintiff's mental illness was severe and persistent and that he had a GAF score of 55. (Tr. 1061.)  On August 13, 2003, the plaintiff had a bone density exam that revealed he had "significant bone mineral density loss." (Tr. 839.)

On September 17, 2003, the plaintiff reported that he had difficulty attending church and Centerstone noted that he was uncooperative during his therapy session. (Tr. 877-78.)  A week later, the plaintiff stated that he only wanted to take medications and did not want to continue with his therapy sessions. (Tr. 976.)  On October 9, 2003, the plaintiff reported to Dr. Barr that he was "barely getting by" but had no suicidal ideation and Dr. Barr concluded that he should continue taking his medication. (Tr. 873-74.)

The plaintiff returned to therapy at Centerstone on October 15, 2003, and stated that if he did not receive disability that he would kill himself. (Tr. 871.)  He also related that "once he got disability he would be making changes in his life" and that "he is doing what his 2 attorneys and doctors want him to do implying that they told him to continue negative behaviors such as isolating himself and trying [not] to work on his issues." (Tr. 872.)  Centerstone noted that it used "cognitive restructuring to point out that [the plaintiff] was saying he can't do certin [sic] things but he was

actually stating he won't do these things and actually has the capability to do these [things] however he chooses not [to] do these things." *Id.*

On October 17, 2003, Dr. Barr completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on the plaintiff and opined that he had a bipolar disorder, ADHD, alcohol dependence, and a personality disorder. (Tr. 1054.) Dr. Barr assigned the plaintiff a GAF score of 55 and noted that he had mood disturbances, emotional liability, psychomotor agitation or retardation, difficulty thinking or concentrating, suicidal ideation, decreased energy, and persistent anxiety. *Id.* Dr. Barr opined that the plaintiff's "psychiatric condition" would not exacerbate his symptoms of pain, he did not have a low IQ, and his impairments would cause him to miss work "[a]bout three times a month." (Tr. 1055.)

Dr. Barr noted that the plaintiff's ability to understand, remember, and carry out short and simple instructions; make simple work-related decisions; ask simple questions; and be aware of normal hazards was "good." (Tr. 1056.) He found the plaintiff's ability to remember work procedures, maintain attention for periods of two hours, perform at a consistent pace with reasonable periods of rest, and appropriately deal with changes at work and work stress was "fair." *Id.* Dr. Barr also opined that the plaintiff's ability to maintain attendance and punctuality, have an ordinary routine, work with others, complete a normal work week, accept instructions and criticism from supervisors, and get along with co-workers was "poor or none." *Id.* He stated that the plaintiff did not have the "mental abilities" to perform semiskilled or skilled work, but that his ability to interact appropriately with the general public, display appropriate social behavior, and maintain his personal hygiene was "fair." (Tr. 1057.) Dr. Barr noted that the plaintiff's ability to travel in "unfamiliar places" and "[u]se public transportation" was "good." *Id.* He concluded that the plaintiff's activities

18

of daily living were moderately impaired and his social functioning and concentration were markedly impaired. (Tr. 1058.) Dr. Barr determined that the plaintiff had suffered from three episodes of decompensation in the prior twelve months. *Id.*

On October 13, 2004, the plaintiff was hospitalized after passing out at the Nashville Union Rescue Mission and Lighthouse Program and reported having left ankle pain. (Tr.1130, 1134.) Although the plaintiff was medically cleared, he was admitted to the psychiatric unit of the Veterans Administration ("VA") Hospital for psychiatric evaluation and diagnosed with "bipolar disorder with hallucinations" and polysubstance dependence. (Tr. 1117, 1132-33.) The plaintiff was assigned a GAF score of 35.[17] (Tr. 1117, 1128, 1132.) On October 15, 2004, a mental health evaluation of the plaintiff indicated that his diagnosis remained unchanged and his treatment plan recommended that he take part in group therapy. (Tr. 1112.) The plaintiff reported that he was beginning to feel "'back more towards normal'" and was able to sleep well for the first time in several days. (Tr. 1107.) Dr. Peter Loosen prescribed Naprosen[18] and Seroquel[19] for the plaintiff. (Tr. 1109.)

On October 16, 2004, a VA nurse reported that the plaintiff had not been a management problem and on October 17, 2004, a nurse noted that the plaintiff did not report any discomfort and was responding well to his medications. (Tr. 1106.) On October 18, 2004, the plaintiff related that he felt "'pretty good'" and that he was "thinking clearer." (Tr. 1103.) The plaintiff's discharge summary on October 19, 2004, noted that his mood was depressed, but that he had no suicidal

---

[17] A GAF score of 31-40 falls within the range of "[s]ome impairment in reality testing or communication [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV-TR at 34.

[18] Naprosen or Naprosyn is a non-steroidal anti-inflammatory drug ("NSAID"). PDR at 2850.

[19] Seroquel is used to treat bipolar disorder and schizophrenia. PDR at 751.

19

ideation. (Tr. 1147.) The plaintiff planned to return to live at the Union Mission and was provided with medication. (Tr. 1148-49.)

On April 24, 2005, the plaintiff presented to the emergency room at Sumner Regional Medical Center with complaints of back and chest pain. (Tr. 1089-91.) Dr. John Pinkston diagnosed the plaintiff with musculoskeletal back pain and acute chest pain, and he prescribed Naprosyn and Hydrocodone. (Tr. 1089, 1091.) Dr. Pinkston noted that the plaintiff's chest pain began when he was being discharged back to his half-way house and the plaintiff attributed his chest pain to the stress of going to the emergency room. (Tr. 1091.) X-rays of the plaintiff's chest were unremarkable and x-rays of his back revealed "[s]ome degenerative spurring." (Tr. 1095-96.)

### B. Hearing Testimony: The Plaintiff and the Vocational Expert

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Karen Vessell, a Vocational Expert ("VE"), testified. (Tr. 1152-1206.) The plaintiff testified that he lives in an apartment and that his right foot impairment makes it difficult for him to navigate the stairs into the apartment. (Tr. 1155-56.) He related that he has fallen down a few times trying to get inside his apartment. (Tr. 1155.) The plaintiff testified that he completed school through eleventh grade, and later received his GED. (Tr. 1156.) The plaintiff stated that he reads books and the newspaper, but that he has difficulty remembering the specific content of what he reads. (Tr. 1156-57.) He related that he completed two years of vocational schooling in computer electronics but that he is not able to apply what he had learned because he is not able to remember the training he received. (Tr. 1158-59.) The plaintiff testified that he began experiencing problems with his memory when he was hit in the head with a concrete block in September of 2000. (Tr. 1159.)

20

The plaintiff reported that he worked as a custodian until he crushed his right foot and left hip and broke both ankles and legs in a car accident. (Tr. 1160.) He explained that he was not able to lift the trash cans or walk great distances. *Id.* The plaintiff testified that he has discomfort in his hip when he sits for lengthy periods of time, is not able to "drive safely" anymore, and would consider himself to be a danger to others if he operated a motor vehicle. (Tr. 1161.) He related that he is only able to walk a quarter of a mile, is dependent on others for transportation, and is not able to operate machinery such as a tractor or lawn mower. (Tr. 1163-64.)

The plaintiff testified that he previously worked as a custodian, electrician, file clerk, church janitor, bottle washer for Coca-Cola, carpenter, cab driver, cemetery worker, and office manager in the United States Navy. (Tr. 1160, 1165-69, 1188.) He stated that he is able to lift and carry up to ten pounds and that people help him carry his groceries into his home. (Tr. 1168.) The plaintiff also explained that he is not able to stay focused, suffers from "horrible depression" and social anxiety, and attempted suicide several times, including trying to drive his car into a bridge in September of 2000. (Tr. 1170-72.) He testified that his medication has helped his physical impairments but not his mental impairments, and that he goes to a psychiatrist and therapist on a regular basis. (Tr. 1172.) The plaintiff related that he has difficulty remembering instructions and interacting with others, would not be able to attend work regularly, and is paranoid and overreacts. (Tr. 1173-75.)

The plaintiff testified that he has experienced significant difficulties in his lower extremities after his motor vehicle accident in 2000. (Tr. 1176.) He described his level of pain, on a typical day, as being a two out of ten, but that on "the worst days" his level of pain can be an eight out of ten. (Tr. 1177.) The plaintiff stated that rainy days increase his level of pain, he is in pain every day, and he walks one quarter of a mile each day because his orthopedist orders him to do so. (Tr. 1178-79.)

21

He testified that his daily activities include taking a shower, reading, watching television, walking, and checking the mail. (Tr. 1180.) The plaintiff also stated that he tried working as a cashier at Dairy Queen, but did not make it through training because it was too painful for him to stand or sit on a stool. (Tr. 1182.)

The plaintiff related that he has cystitis, which causes him "to go to the restroom like every 15 to 30 minutes." (Tr. 1192.) He testified that he lives alone, cleans his apartment, does laundry, attends church, and has some difficulty dressing himself. (Tr. 1192-93.) The plaintiff stated that he was a heavy drinker until his automobile accident in September of 2000 and that he has not drunk alcohol in two years. (Tr. 1994-95.)

The VE described the plaintiff's previous jobs as a cemetery worker as heavy work and semi-skilled, as a custodian and a cab driver as medium work and semi-skilled, as a director of religious services[20] as sedentary work and skilled, as a building maintenance repairer as medium work and skilled, and as a cleaning crew manager as light work and skilled.[21] (Tr. 1197-1200.) The ALJ asked the VE to consider whether a person of the plaintiff's age, work experience, and education would be able to perform a light level of work that required standing/walking for four hours in an eight hour workday and occasional climbing of stairs and ramps; allowed avoidance of "extremes in temperature, dampness, wetness and humidity, vibrations, jars and jolts, hazardous machinery and

---

[20] The plaintiff's title in the U.S. Navy was religious program specialist, which he described as an office manager (Tr. 98, 1169), and the VE classified as a director of religious services. (Tr. 1199.)

[21] The ALJ asked the VE to classify one of the plaintiff's past jobs, but the name of the job is missing from the hearing transcript because it was inaudible. (Tr. 1200.) The VE classified this unlabeled job as light and semi-skilled. *Id.* Based on subsequent testimony, it appears that the VE referred to that job as a clerk at the VA Hospital. (Tr. 1201.)

22

unprotected heights and no sharp objects whatsoever;" and permitted "a moderate limitation as to understanding, remembering and carrying out detailed instructions, [and] maintaining attention and concentration for an extended period of time." (Tr. 1200-01.) The VE opined that the plaintiff could perform his past relevant work as a clerk at the VA Hospital.[22] (Tr. 1201.)

The ALJ then asked the VE to describe what other jobs the plaintiff could perform at the light level of work, and the VE replied that he could perform work as an assembler, product inspector, stocking inventory clerk, and file clerk. (Tr. 1201-02.) The VE testified that the plaintiff's computer training would allow him to perform work as a computer electronics technician since he would not have to lift computers and could sit on a bench while working. (Tr. 1204.) The ALJ asked the VE to consider the limitations Dr. Barr assigned the plaintiff in his mental RFC, including the plaintiff's "poor to no ability" to maintain attendance, be punctual, sustain an ordinary routine, or work with others, and the VE answered that the plaintiff would not be able to work. *Id.*

### III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on August 10, 2004. (Tr. 25-33.)  Based on the record, the ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Act on September 4, 2000, his alleged disability onset date, and continues to meet them through at least the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since September 4, 2000.

3.  The claimant's "severe" impairments are osteopenia, degenerative changes in the right foot, hepatitis C, a bipolar disorder (not

---

[22] *See* n.21 *supra.*

23

otherwise specified), an attention-deficit disorder, a personality disorder (not otherwise specified), a history of alcohol dependence, and the residuals of closed reduction and percutaneous screw fixation of the left distal tibia and fibula, open reduction and internal fixation (ORIF) of the left acetabulum, ORIF of the right distal fibula, and a right ankle arthrodesis, but he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    As discussed above, the claimant's credibility was poor.

5.    The claimant can perform the residual functional capacity described above.  20 CFR §§ 404.1545 and 416.945.

6.    The claimant's past relevant work as an office manager could be performed with the above limitations per the vocational expert's testimony.  20 CFR §§ 404.1565 and 416.965.

7.    The claimant's impairments do not prevent him from performing his past relevant work.

8.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision.  20 CFR §§ 404.1520(e) and 416.920(e).

(Tr. 32.)


# IV.  DISCUSSION

## A.  Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases).  The Commissioner's decision must be affirmed if it is supported by substantial

24

evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

25

Second, the plaintiff must show that he suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant

26

work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform, he is not disabled.[23] *Id. See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d

---

[23] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

27

860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process, and ultimately determined that the plaintiff was not disabled as defined by the Act. (Tr 32.) At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since September 4, 2000, the alleged onset date of disability. *Id.* At step two, the ALJ found that the plaintiff's osteopenia, degenerative changes in the right foot, hepatitis C, bipolar disorder, attention-deficit disorder, personality disorder, history of alcohol dependence, and residuals of closed reduction and percutaneous screw fixation of the left distal tibia and fibula, ORIF of the left acetabulum, ORIF of the right distal fibula, and a right ankle arthrodesis were severe impairments. *Id.* At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.* At step four, the ALJ concluded that the plaintiff was able to perform his past relevant work as an office manager. *Id.*

The ALJ also included an alternative step five finding in his decision, concluding that even if the plaintiff could not perform his past relevant work he could perform work as a bench assembler, assembler, file clerk, stock/inventory clerk, and production inspector. *Id.* The effect of this decision was to preclude the plaintiff from DIB and SSI benefits and to find him not disabled, as defined in the Act, at any time after September 4, 2000, through the date of the decision.

28

## C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in finding that at step four the plaintiff could perform his past relevant work as an office manager and in assessing the medical opinions of the plaintiff's treating psychiatrist, Dr. Barr. Docket Entry No. 14 at 13-16, 19-21.  He also argues that substantial evidence in the record does not support the ALJ's alternative step five decision that the plaintiff could perform other substantial gainful employment and that the ALJ failed to comply with Social Security Ruling ("SSR") 00-4p by not asking the VE specifically about the Dictionary of Occupational Titles ("DOT"). Docket Entry No. 14 at 11-12, 16-18.

### 1. The ALJ erred in concluding at step four of the five step evaluation process that the plaintiff could perform his past relevant work as an office manager.

The plaintiff asserts that the ALJ incorrectly determined that the plaintiff could perform his past relevant work as an office manager.  Docket Entry No. 14 at 13-16.  The Commissioner concedes that the ALJ "misidentified the past relevant work which the VE testified the plaintiff could perform and is not defending the determination as step four of the sequential evaluation." Docket Entry No. 17, at 8.   The regulations state that "[w]e consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity."[24] 20 C.F.R. §§ 404.1565(a), 416.965(a).  SSR 82-62 explained that the "15 year period is generally the 15 years prior to the time of adjudication at the initial, reconsideration, or higher appellate level." 1982 WL 31386, at *2.

---

[24] The regulations explain that the rationale for the 15 year requirement is "[a] gradual change occurs in most jobs so that after 15 years it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply. The 15–year guide is intended to insure that remote work experience is not currently applied." 20 C.F.R. §§ 404.1565(a), 416.965(a).

The plaintiff last worked as an office manager in January of 1989 (Tr. 98),[25] and the Commissioner's decision to deny his applications for disability became final on July 27, 2006. (Tr. 9-12.)  In light of SSR 82-62, it is clear that the plaintiff's past job as an office manager is too remote to be considered as past relevant work since he last worked there more than 15 years ago. 1982 WL 31386, at *2.  Neither the Commissioner nor the substantial evidence in the record supports the ALJ's step four determination that the plaintiff could perform his past work as an office manager.  Thus, the Court will focus only on the plaintiff's assertions of error pertaining to step five of the five step evaluation process.

### 2. The ALJ properly assessed the medical evidence of the plaintiff's treating psychiatrist.

Dr. Barr first treated the plaintiff on December 5, 2000, when he completed a psychiatric evaluation. (Tr. 512-13.)  Over the next three years, Dr. Barr conducted multiple follow-up visits with the plaintiff (Tr. 515, 873-74, 885-88, 891-92, 897-98, 960-61, 965, 971, 982-84, 1054) and given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[26]  The plaintiff

---

[25] It is not necessary to determine whether the plaintiff's job as a religious program specialist in the Navy was really an office manager.  It is clear, however, that whatever the job was, it was not equivalent to a director of religious services in a non-profit organization or church, as the VE suggested. *See* Tr. 1199.

[26]  A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical

argues that the ALJ erred by failing to give the appropriate weight to Dr. Barr's Medical Source Statement from October 17, 2003, and by failing to provide good reasons for rejecting Dr. Barr's medical opinions. Docket Entry No. 14, at 19-21.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) . Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The limitations that Dr. Barr assigned the plaintiff in his Medical Source Statement were not supported by his treatment notes or the evidence in the record. Although Dr. Barr diagnosed the plaintiff with bipolar disorder and a history of alcohol abuse (Tr. 513), he repeatedly noted that medication stabilized and improved the plaintiff's mental impairment (Tr. 515, 960, 965, 967, 984, 989) and the lowest GAF score that he assigned the plaintiff was a 55. (Tr. 513, 1054.)

Dr. Barr's Medical Source Statement was also inconsistent with the findings Dr. Pettigrew and Dr. Walker and the plaintiff's own daily activities. A psychiatric evaluation completed by Dr. Pettigrew indicated that

---

condition(s).

31

> Mr. Bratton show[ed] no signs of impaired ability to understand, remember or carry out simple verbal instructions. During the administration of psychological tests he demonstrated good attention, concentration and persistence. He was intrinsically motivated and did not appear to be distracted by internal or environmental stimuli. He demonstrated excellent verbal and communication skills. Although he reported some ongoing experience with both auditory and visual hallucinations, his clinical presentation and responses to psychodiagnostic tests revealed no evidence of current psychosis.

(Tr. 523-24.) Dr. Walker completed a PRTF and opined that the plaintiff exhibited affective disorders and substance addiction disorders but that his impairments were not severe. (Tr. 525.) Dr. Walker reported that the plaintiff's activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace were all mildly restricted. (Tr. 535.) He also noted that the plaintiff suffered from one or two repeated episodes of decompensation. *Id.* Dr. Walker found that the ratings Dr. Barr assigned the plaintiff were "inconsistent with his function and . . . near normal mental health status," and that the plaintiff was able to shop and attend church. (Tr. 537.) He explained that the plaintiff's medical record evidence supported "a history of severe mood, substance, and head injury problems that have now abated with treatment, abstinence, and physical recovery." *Id.*

Dr. Pettigrew's and Dr. Walkers's evaluations do not align with Dr. Barr's Medical Source Statement that indicated that the plaintiff had poor attention and concentration, and that the plaintiff's ability to maintain attendance and punctuality, have an ordinary routine, work with others, complete a normal work week, accept instructions and criticism from supervisors, and get along with co-workers was "poor or none." (Tr. 1054, 1056.) Furthermore, for nearly two years the plaintiff took courses in computer electronics at the Tennessee Technology Center (Tr. 909, 954-55, 960, 967, 984) and received a Computer and Network Service Technician diploma. (Tr. 153-56, 890.)

32

Therefore, Dr. Barr's Medical Source Statement did not deserve controlling weight since it was not supported by his own treatment notes or the evidence in the record.

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factors of consistency and supportability in discounting the severe functional limitations Dr. Barr assigned to the plaintiff. The ALJ stated:

> Dr. Barr's assessment is inconsistent with the GAF scores that he assigned the [plaintiff] both contemporaneously with the assessment and with previous ones. Also, as discussed above, the [plaintiff] told Ms. Harris that his attorneys and physicians had told him to maintain "negative behaviors" presumably to increase his chances of being found disabled. Ms. Harris noted that the [plaintiff] was "very resistant to efforts to motivate him." Also, the [plaintiff] received a diploma in computer and network service since his alleged disability onset date and since he started seeing Dr. Barr. Finally, the [plaintiff] cancelled or failed to keep several appointments with Dr. Barr and Ms. Harris. Dr. Barr's assessment, therefore, receives little weight.

33

(Tr. 31.) As previously addressed, the lowest GAF score Dr. Barr assigned the plaintiff and the GAF score he listed in his Medical Source Statement was 55. (Tr. 513, 1054.) Dr. Barr also assigned the plaintiff GAF scores of 63 and 64 on several occasions. (Tr. 684-85, 960, 971) A GAF score of 55 indicates that a person has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning," and a GAF score of 63 or 64 indicates that a person has "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

Even though a GAF score is not dispositive in determining an individual's mental RFC, it can be helpful in assessing an individual's mental RFC. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. Feb. 9, 2006) (quoting DSM-IV-TR 34 (4th ed. 2000)). *See also Kennedy v. Astrue*, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 415 (6th Cir. Dec. 15, 2006).[27] The GAF scores Dr. Barr assigned to the plaintiff describe an individual who has moderate or mild difficulty functioning, and those scores

---

[27] As explained in *Kornecky*,

> GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates "[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain personal hygiene or serious suicidal act with clear expectation of death." At the high end, GAF 91-100 indicates "[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms." A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning.

167 Fed. Appx. at 503 n.7 (quoting DSMV-IV-TR at 34) (internal citations omitted).

34

conflict with his Medical Source Statement that indicated the plaintiff had poor to no mental ability or aptitude to perform skilled or unskilled work. (Tr. 1056-57.) Further, Dr. Barr found that the plaintiff was markedly limited in his ability to maintain social functioning and concentration, persistence, or pace. (Tr. 1058.) The Medical Source Statement defined marked as meaning "more than moderate, but less than severe," yet the GAF score Dr. Barr assigned the plaintiff in the same Medical Source Statement indicates that the plaintiff had only moderate symptoms or difficulty with either social or occupational functioning. *Id.*

Dr. Barr's Medical Source Statement also does not align with psychiatric evaluations completed by consultating physicians, Dr. Pettigrew and Dr. Walker. Dr. Pettigrew found that the plaintiff could carry out and understand simple instructions, demonstrated good attention and concentration, and had good communication skills. (Tr. 523-34.) Dr. Walker concluded that the plaintiff's daily activities, social functioning, and concentration, persistence, or pace were only mildly limited. (Tr. 535.) He also noted that the limitations Dr. Barr assigned the plaintiff were inconsistent with the plaintiff's ability to function and "near normal mental health status." (Tr. 537.) Further diminishing the accuracy of Dr. Barr's medical Source Statement was the plaintiff's own comments. On October 15, 2003, two days before Dr. Barr completed his Medical Source Statement, the plaintiff told a Centerstone nurse that he would only "make changes in his life" after he received disability benefits and that he was doing what his attorneys and doctors were telling him to do, "implying that they told him to continue negative behaviors such as isolating himself and trying [not] to work on his issues." (Tr. 872.) Centerstone used "cognitive restructuring to point out that [the plaintiff] was saying he can't do certain things but he was actually stating he won't do these

35

things and actually has the capability to do these [things] however he chooses not [to] do these things." *Id.*

Dr. Barr's Medical Source Statement on the plaintiff was inconsistent with his own treatment notes and assigned GAF scores, unsupported by the plaintiff's own statements, and inconsistent with the psychiatric evaluations conducted by two other physicians. The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding "little weight" to Dr. Barr's Medical Source Statement and substantial evidence in the record supports that determination.


### 3. Substantial evidence in the record supports the ALJ's determination that the plaintiff could still perform substantial gainful employment.

The plaintiff argues that substantial evidence in the record does not support the ALJ's alternate step five conclusion that he could perform work as a product inspector, bench assembler, or file clerk. Docket Entry No. 14, at 16-19. First, the plaintiff contends that substantial evidence does not support the ALJ's determination that there are 50,000 product inspector jobs nationwide. Docket Entry No. 14, at 17. While it is true that the ALJ misstated the VE's testimony identifying the number of product inspector jobs, since the VE testified that there were 6,000 and not 50,000 product inspector jobs nationwide (Tr. 1202), the plaintiff's argument fails to raise any further error. At the fifth step of the five step evaluation process, the Commissioner has the burden of proving that there is work in the economy that the plaintiff can perform. *Her*, 203 F.3d at 391. To meet that burden, the Commissioner's finding that there is available work in the national economy for the plaintiff to perform must be "'supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs.'" *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785

(6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987)). Such substantial evidence "'may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only if the question accurately portrays [the plaintiff's] individual and mental impairments.'" *Id.*

It is clear from the hearing transcript that the ALJ asked the VE a hypothetical that accurately detailed the plaintiff's impairments and the VE answered that the plaintiff could perform 6,000 product inspector jobs even with those impairments. (Tr. 1200-02.) The ALJ's misstatement of the number of product inspector jobs in the national economy does not undercut the VE's testimony that there are such jobs available for the plaintiff to perform and it should be viewed as nothing more than a clerical error.

The plaintiff also argues that substantial evidence does not support the ALJ's determination that he could perform work as a file clerk or bench assembler, semi-skilled or skilled jobs, since the ALJ concluded at step two of the five step evaluation process that he had a severe mental impairment. Docket Entry No. 14, at 18. Specifically, the plaintiff maintains that the ALJ's determination that he had a severe mental impairment precludes him from performing unskilled work, and thus semi-skilled and skilled work. *Id.* A severe impairment is defined as being an impairment that "significantly limits an individual's physical or mental abilities to do basic work activities." SSR 96-3P, 1996 WL 374181, at *1. The plaintiff reasons that if his mental ability to do basic work activities, such as understanding, carrying out, and remembering simple instructions,

is significantly limited then so to would be his ability to perform unskilled work.[28] Docket Entry No. 14, at 19.

The Sixth Circuit has construed the step two severity determination as a "de minimis" hurdle in the five step sequential process, but it still effectively screens out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63 (quoting *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89-90 (6th Cir. 1985), and citing *Murphy v. Sec'y of Health & Human Servs*., 801 F.2d 182, 185 (6th Cir. 1986)). A step two determination that an individual has a severe impairment "'may or may not affect [that individual's] functional capacity to do work. One does not necessarily establish the other.'" *Markel v. Comm'r of Soc. Sec.*, 2009 WL 3271191, at *9 (E.D.Mich. Oct. 13, 2009) (quoting *Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, *5 (E.D.Mich. July 14, 2004).  Further, the Sixth Circuit has noted that "[t]he regulations recognize that individuals who have the same severe impairment may have different RFCs depending on their other impairments, pain, and other symptoms." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. Feb. 9, 2007).  *See also* 20 C.F.R. § 404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment

---

[28] Unskilled work is defined as

> work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

20 C.F.R. § 404.1568(a).

in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.").

The ALJ's step two finding that the plaintiff suffers from a severe mental impairment does not, on its own, preclude him from performing unskilled work since it is only one part of making an RFC determination. The plaintiff's RFC details what level of work he is able to perform and "not what maladies [he] suffers from-though the maladies will certainly inform the ALJ's conclusion about [his] abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir.2002). Since the ALJ's RFC determination of the plaintiff is supported by substantial evidence in the record, the plaintiff's argument that he is not able to perform unskilled work, and therefore semi-skilled or skilled work, is unavailing.

The plaintiff also argues that he could not perform work as a bench assembler because the part of the hearing transcript describing the skill level of that job is "inaudible" and the ALJ's finding that he could perform work as a bench assembler due to his recent vocational education violated Tables one and two of 20 C.F.R. Pt. 404, Subpt. P, App. 2 .[29] Docket Entry No. 14, at 16-17; Docket Entry No. 18, at 6. Specifically, the plaintiff contends that since the regulations only allow an individual's level of education to transfer to a "skilled" level of work and it could not be determined from the hearing transcript what skill level of work a bench assembler requires, then the plaintiff is precluded from performing work as a bench assembler. *Id.*

---

[29] The plaintiff originally argued that 20 C.F.R. § 404.1568(d)(4) also applied to whether the plaintiff's vocational training as an electronics technician could be considered a transferrable skill. Docket Entry No. 14, at 16-17. However, as the Commissioner pointed out, 20 C.F.R. § 404.1568(d)(4) applies to individuals who are of advanced age, or age 55 or older, and thus is not applicable to the plaintiff since he was 52 years old at the time of the ALJ's decision. Docket Entry No. 17, at 11.

The Commissioner is typically able to meet his burden of proof at the fifth step of the five step evaluation by referring to 20 C.F.R. Pt. 404, Subpt. P, App. 2, or the medical vocational "grid." *Allison v. Apfel*, 229 F.3d 1150, 2000 WL 1276950, at *3 (6th Cir. Aug. 30, 2000) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2). Application of the grids results in a finding of disabled or not disabled based upon the plaintiff's exertional restrictions, age, education, and prior work experience. *Allison*, 229 F.3d 1150, at *3 (citing *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1173 (6th Cir.1990)). However, if the plaintiff has both exertional and nonexertional limitations, the ALJ is not able to rely solely on the grids to determine whether the plaintiff is disabled. *Id.* ; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e). In determining whether "there remains a significant number of jobs that the [plaintiff] can perform" the ALJ "may rely on the assistance of a vocational expert to make his determination." *Allison*, 229 F.3d 1150, at *3 (citing *Damron v. Sec'y of Health & Human Servs.*, 778 F.2d 279, 282 (6th Cir.1985).

Given the ALJ's finding that the plaintiff suffered from both exertional and nonexertional impairments, he was precluded from applying the grids. (Tr. 32.) The ALJ also complied with Sixth Circuit case law by relying on VE testimony before concluding that the plaintiff's educational training allowed him to perform work as a bench assembler. (Tr. 32, 1202-04.) Further, while the plaintiff does correctly point out that the hearing transcript has several inaudible portions during the VE's testimony, specifically when the VE describes the skill level required to perform work as a bench assembler, the transcript clearly shows that the VE properly considered the plaintiff's limitations before testifying that he could perform work as a bench assembler. *Id.* The ALJ did not err in relying on the VE's testimony instead of on the grids and the VE's conclusion that the plaintiff

could perform work as a bench assembler took into consideration the plaintiff's exertional and nonexertional limitations.

### 4. The ALJ's failure to ask the VE specifically about the DOT and comply with SSR 00-4p was harmless error.

The plaintiff alleges that the ALJ failed to comply with SSR 00-4p since he did not explicitly ask the VE whether her testimony was consistent with the DOT. Docket Entry No. 14, at 11-12. The plaintiff contends that the hypothetical the ALJ presented to the VE contained a conflict since the ALJ determined that the plaintiff could perform a light level of work, which requires an individual to stand or walk for six hours in an eight hour workday, but restricted the plaintiff's ability to stand or walk for four hours in an eight hour workday. *Id.*

ALJs have an "affirmative duty" to ask VEs whether "the evidence that they have provided 'conflicts with the information provided in the DOT [Dictionary of Occupational Titles].'" *Lindsley v. Comm'r of Soc. Sec*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting SSR 00-4p, 2000 WL 1898704, at 4). An ALJ's failure to specifically question the VE about any conflicts his evidence may have with the DOT is typically viewed as harmless error. *Fleeks v. Comm'r of Soc. Sec*, 2009 WL 2143768, at *6 (E.D. Mich. July 13, 2009); *Masters v. Astrue*, 2008 WL 4082965, at *3 (E.D. Ky. Aug. 29, 2008). However, when the VE's testimony is in conflict with the DOT, the ALJ has the additional duty to obtain a reasonable explanation for the discrepancy. *Fleeks*, 2009 WL 2143768, at 6; SSR 00-4p, at 4 ("When vocational evidence provided by a VE or VS [vocational specialist] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved

41

the conflict."). Thus, if there is no inquiry into whether the VE's testimony is consistent with the DOT and there is, in fact, an inconsistency, the ALJ's error is not harmless. *Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 575 (6th Cir. Apr. 26, 2007); *Fleeks*, 2009 WL 2143768, at 6.

The inconsistency that the plaintiff identifies is with the ALJ's hypothetical posed to the VE in which the plaintiff is able to perform light work even though he is able to stand/walk for only four hours in an eight hour workday. The plaintiff contends that the DOT requires an individual who is able to perform light work to be able to stand/walk for six hours in an eight hour workday, and thus the ALJ's hypothetical and the VE's subsequent reliance on it are inconsistent with the DOT. Docket Entry No. 14, at 11-13.

The definitions for exertional classifications, such as light work, are the same in the DOT and in the regulations. SSR 00-4p, 2000 WL 1898704, at 3. The regulations define light work as involving a "good deal of walking or standing," and SSR 83-10 clarifies that definition by noting that light work "requires standing or walking off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. §§ 404.1567(a), 416.967; SSR 83-10, 1983 WL 31251, at 5. However, SSR 00-4p explains that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. A VE, VS [vocational specialist], or other reliable source of occupational information may be able to provide more specific information about jobs or occupations than the DOT." 2000 WL 1898704, at 3. *See also Beinlich v. Comm'r of Soc. Sec.*, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009) (quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir.2003) ("The ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity.'")). Thus, the ALJ did not err in concluding that the plaintiff

42

could stand for four hours and still perform light work and the VE properly relied upon the ALJ's hypothetical in concluding that the plaintiff was still able to perform substantial gainful activity.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that ALJ's alternate step five decision that the plaintiff could still perform substantial gainful activity should be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge

43